



FILED

Jun 30 2026, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Freedom Property Solutions, LLC,

*Appellant-Defendant*

v.

Lindsey McGhee, Individually, Lindsey McGhee, as Parent and Natural Guardian of K.M., Deceased, Lindsey McGhee, as Parent and Natural Guardian of J.M., a Minor, and Walter Duncan,

*Appellees-Plaintiffs*

---

June 30, 2026

Court of Appeals Case No.
25A-CT-2810

Interlocutory Appeal from the Huntington Circuit Court

The Honorable Andrew K. Antrim, Special Judge

Trial Court Cause No.
35C01-2502-CT-114

**Opinion by Judge Mathias**
Judges May and Foley concur.

**Mathias, Judge.**

Freedom Property Solutions, LLC appeals the trial court's entry of summary judgment for Lindsey McGhee, individually and on behalf of her two minor children, and Walter Duncan. Freedom Property raises a single issue for our review, namely, whether the contract between it and McGhee and Duncan was a residential lease or a land-sale contract.

We reverse and remand for further proceedings consistent with this opinion.

## Facts and Procedural History[1]

On February 28, 2019, McGhee and Duncan entered into a contract ("the Contract") with Freedom Property. The Contract was titled "Land Installment Contract." Appellant's App. Vol. 3, p. 31. It identified Freedom Property as a "Seller" and McGhee and Duncan as "Purchaser[s]." *Id.* It identified certain real property and its improvements, which included a residential structure, as

---

[1] We held oral argument in this case on June 11, 2026, in the Circuit Court courtroom of the historic Allen County Courthouse. We thank the Allen Circuit Court and its staff as well as the Allen County Bar Association for their kind hospitality. We also thank counsel for the quality of their written and oral advocacy.

the "Premises" that McGhee and Duncan were "buying" under the Contract. *Id.*

[4]     The Contract stated that the Premises were being sold "AS IS" and "without any representations or warranties of any kind" for a total purchase price of $49,900. *Id.* McGhee and Duncan made a "down payment" of $2,495 at the time they executed the Contract; that amount was deducted from the total purchase price, and the remainder of the purchase price was amortized, in accordance with an amortization schedule, over 180 months at an 8% interest rate (such that McGhee and Duncan owed Freedom Property $453 per month under the Contract). *Id.* at 32. The Contract also required a separate $78.33 monthly payment from McGhee and Duncan to Freedom Property for taxes and other assessments, which monthly amount was subject to change.

[5]     The Contract stated that McGhee and Duncan were to "use, maintain[,] and occupy the Premises in accordance with any and all building and use restrictions applicable; to keep the Premises in accordance with all . . . regulations . . . ; to keep and maintain the Premises and the buildings" in no worse condition than they were upon execution of the Contract or possession of the Premises; and to not "diminish the value of Seller's security" without Freedom Property's consent. *Id.* at 33. Similarly, the Contract provided that McGhee and Duncan were "solely responsible for . . . bringing the Premises . . . to a habitable condition within" four months of their execution of the Contract and to "properly maintain[] and us[e] the Premises" to avoid any code violations. *Id.*

[6]     In addition, the Contract stated that, if McGhee and Duncan "fail[ed] to perform" their obligations, including if they missed any required payments, Freedom Property could "declare this Contract forfeited and void[] and may retain any payments made and all improvements to the Premises . . . ." *Id.* at 32. In the event of a default, the Contract provided that Freedom Property would provide McGhee and Duncan with thirty days to cure the default. If they failed to do so, Freedom Property could then "evict or foreclose, as required by state law, to recover the Premises." *Id.* Freedom Property also reserved the right to enter and inspect the Premises at any time.

[7]     Regarding insurance obligations, the Contract required McGhee and Duncan to pay the monthly premiums required to insure the Premises in the event of loss or damage. The ensuing policy, in accordance with the Contract's terms, identified Freedom Property as the loss payee. The Contract required a minimum coverage amount of $47,405, the total amount of McGhee and Duncan's borrowed sums, but permitted McGhee and Duncan to obtain a higher policy amount. They did not do so, however. The Contract also advised McGhee and Duncan that they would be responsible for obtaining other coverage to protect against the risk of loss of their personal property and contents at the Premises.

[8]     The Contract stated as follows with respect to the disposition of any insurance proceeds:

> In case of loss or damage as a result of which insurance proceeds are available in an amount sufficient to repair or rebuild the

Premises, Purchaser[s] ha[ve] the right to elect to use the insurance proceeds to repair or rebuild. To elect to exercise the right, Purchaser[s] must give Seller written notice of the election within 60 days of the loss or damage. If the election is made, the insurance proceeds shall be used for that purpose. If the insurance proceeds are not sufficient to repair or rebuild the Premises, Purchaser[s] may elect to use the proceeds to repair or rebuild by giving written notice of the election within 60 days of the loss o[r] damage and, along with the notice, deposit with Seller an amount sufficient to provide for full payment of the repair and rebuilding. If the election and deposit, if required, are not timely made, the insurance proceeds shall be applied on this Contract. If the insurance proceeds exceed the amount required for repairing and rebuilding, the excess shall be applied first toward the satisfaction of any existing defaults . . . . Any surplus of proceeds in excess of the balance owing on this Contract shall be paid to Purchaser[s].

*Id.* at 33-34.

Finally, the Contract stated:

The Seller may sell, assign[,] or transfer all or any portion of its rights or obligations under this Contract without the prior written consent of the Purchaser[s]. The Purchaser[s] cannot sell, assign, convey, encumber[,] or transfer all or any portion of [their] rights or obligations under this Contract without the prior written consent of Seller.

*Id.* at 35.

The Contract was recorded with the county recorder. However, no deed naming McGhee and Duncan as owners of the Premises was recorded, and no separate lien by Freedom Property against such a deed was recorded. Instead,

McGhee and Duncan would acquire legal title to the Premises only upon their completion of all payments to Freedom Property as required over the life of the Contract.

Upon their execution of the Contract on February 28, 2019, McGhee and Duncan moved into the residence on the Premises with McGhee's two minor children, J.M. and K.M. Three and one-half years later, on August 4, 2022, a house fire occurred at the residence while the two children were asleep. K.M. suffered severe injuries and died as a result two days later. There were no smoke detectors inside the house on the date of the fire or at any time after McGhee and Duncan had moved into the residence.

At the time of the fire, McGhee and Duncan had paid $6,435 in principal to Freedom Property under the Contract. Appellant's App. Vol. 4, p. 92 (payment number 41). The insurance carrier paid the full amount of the policy ($47,405) to Freedom Property. Twenty-one days after the fire, and apparently without having heard from McGhee and Duncan about their preferred disposition of the insurance proceeds, Freedom Property applied those proceeds to the remainder of McGhee and Duncan's balance under the Contract. It further appears that Freedom Property, at least initially, kept what would have been the surplus $6,435. Freedom Property then informed McGhee and Duncan that they now owned the Premises free and clear of Freedom Property's interest.

In October 2023, McGhee, on her own behalf as well as on behalf of her children, filed her complaint against Freedom Property, which Duncan later

joined. In their complaint, they alleged that the Contract was a residential lease, and, under Indiana landlord-tenant law, Freedom Property had negligently caused K.M.'s death and other injuries by not having working smoke detectors inside the residence and by not maintaining the Premises in a habitable condition. In response, Freedom Property argued that the Contract was a land-sale contract, and, thus, Freedom Property had no duty under landlord-tenant statutes to ensure the safety or habitability of the Premises. Freedom Property also sought to compel McGhee and Duncan to accept title to the Premises; at oral argument before our Court, the parties agreed that this request included compelling McGhee and Duncan to accept a payment from Freedom Property in the amount of $6,435.

[14] The parties eventually filed cross motions for summary judgment on the question of whether the Contract was a residential lease or a land-sale contract. After a hearing, the trial court entered summary judgment for McGhee and Duncan. The court then certified its summary-judgment order for interlocutory review, which we have accepted. *See* Ind. Appellate Rule 14(B).

## Standard of Review

[15] Freedom Property appeals the trial court's entry of summary judgment for McGhee and Duncan. As our Supreme Court has made clear:

> [w]e review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

The initial burden is on the summary-judgment movant to "demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact. *Id.* at 761-62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court." *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (omission and some alterations original to *Hughley*).

[16] Summary judgment is particularly appropriate where the sole question between the parties is a question of law. *See, e.g.*, *City of Marion v. London Witte Grp., LLC*, 169 N.E.3d 382, 390 (Ind. 2021). The fact that the parties have filed cross motions for summary judgment neither alters our standard of review nor changes our analysis—we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Erie Indem. Co. v. Estate of Harris*, 99 N.E.3d 625, 629 (Ind. 2018). Further, we are not bound

by the trial court's explanation for its summary judgment ruling. *Markey v. Estate of Markey*, 38 N.E.3d 1003, 1006-07 (Ind. 2015).

## The Contract was a contract for the sale of land, not a lease.

[17] The question on appeal is whether the Contract was a residential lease or a land-sale contract, which is a question of law we review de novo. *See, e.g., Rainbow Realty Grp., Inc. v. Carter*, 131 N.E.3d 168, 173-74 (Ind. 2019). In considering what a written contract is, we look to its substance over its form. *See, e.g., id.* The intent of the contracting parties, as manifested by the whole of the contract, is controlling. *See, e.g., Vic's Antiques & Uniques, Inc. v. J. Elra Holdingz, LLC*, 143 N.E.3d 300, 304 (Ind. Ct. App. 2020), *trans. denied*.

[18] As our Supreme Court has explained:

> Under a typical conditional land contract, the [seller] retains legal title until the total contract price is paid by the [buyer]. Payments are generally made in periodic installments. *Legal title does not vest in the [buyer] until the contract terms are satisfied, but equitable title vests in the [buyer] at the time the contract is consummated. When the parties enter into the contract, all incidents of ownership accrue to the [buyer]. The [buyer] assumes the risk of loss and is the recipient of all appreciation in value.* The [buyer], as equitable owner, is responsible for taxes. The [buyer] has a sufficient interest in land so that upon sale of that interest, he holds a vendor's lien.

> This Court has held, consistent with the above notions of equitable ownership, that *a land contract, once consummated[,] constitutes a present sale and purchase.* The [seller] has, in effect, exchanged his property for the unconditional obligation of the [buyer], the performance of which is secured by the retention of the legal title. The Court, in effect, views a conditional land

contract as a sale with a security interest in the form of legal title reserved by the [seller]. Conceptually, therefore, the retention of the title by the [seller] is the same as reserving a lien or mortgage. Realistically, [the seller-buyer relationship] should be viewed as mortgagee-mortgagor. To conceive of the relationship in different terms is to pay homage to form over substance.

*Skendzel v. Marshall*, 261 Ind. 226, 301 N.E.2d 641, 646 (1973) (citation modified; emphases added); *see also* C.J.S. *Equity* § 57 (2019) (recognizing an equitable title owner as one "who is the owner of the subject matter[] but does not have the legal title").

[19]   Accordingly, as a matter of Indiana law, a buyer's breach of a land-sale contract invokes the remedies provided for under Indiana's foreclosure statutes. *Skendzel*, 301 N.E.2d at 648-49; *see E. Point Bus. Park LLC v. Priv. Real Est. Holdings, LLC*, 49 N.E.3d 589, 606-07 (Ind. Ct. App. 2015) (noting that a foreclosing lienholder "may have the right to sell the [p]roperty at a foreclosure sale to satisfy the balance of [a] loan, but this does not automatically give it the right to possess the [p]roperty, nor is any surplus kept as a windfall by the [lienholder]"); *see also* Ind. Code § 32-30-10-14 (2018) (providing for the distribution of proceeds from a foreclosure sale, which includes, following payments to lienholders, that any surplus be paid to "the mortgage debtor").

[20]   Here, much of the parties' dispute focuses on two precedent opinions. First, in *Rainbow Realty*, a couple with poor credit entered into a "rent-to-buy" agreement with a property manager to eventually purchase a single-family home that was "not currently habitable." 131 N.E.3d at 171. The rent-to-buy

agreement identified the property as being sold "as is" and placed the burden on the couple "to make it habitable." *Id.* The agreement provided that the couple would make monthly payments toward principal and interest in accordance with an amortization schedule over thirty years.

[21] However, "[d]espite the stated intent and thirty-year payment term, the [a]greement said that the first twenty-four payments were 'rental payments,'" and, if the couple satisfactorily made those payments, the parties would then "execute a separate 'Conditional Sales Contract (Land Sale)' for the remaining twenty-eight years." *Id.* As our Supreme Court explained, those first two years of payments represented "the [c]ouple's inability to afford a down payment" for the premises. *Id.* at 173.

[22] The couple breached the terms of the rent-to-buy agreement during the initial two-year period, and the property manager commenced eviction proceedings in small claims court. The couple then sought to hold the property manager and others to Indiana's statutory requirements that leased residences be delivered in a "safe, clean, and habitable condition." *Id.* at 173-74 (citing Ind. Code § 32-31-8-5(1) (2012)). Despite having initiated an eviction instead of a foreclosure, the property manager argued that the rent-to-buy agreement was a conditional land-sale contract and, thus, was not subject to Indiana's residential landlord-tenant statutes. *See* I.C. § 32-31-2.9-4(2).

[23] Our Supreme Court agreed with the couple that, at least during the initial two-year term when their breach occurred, the rent-to-buy agreement was "a

residential lease with a contingent commitment to sell." *Rainbow Realty*, 131 N.E.3d at 173. The Court began by recognizing that the rent-to-buy agreement did "contain[] several indicia of a purchase." *Id.* In particular, the Court noted the following:

> The purchase-agreement declaration explains the difference between renting and buying, and the Couple indicated they were buying: "My intent is to . . . purchase the property at . . . N. Oakland Av., Indianapolis[.] I am not renting the property." The Couple's declaration continues with each of them agreeing to the following terms: "I wish to save money by repairing & maintaining the property myself. I do not expect the property owner to make any repairs to the property and fully understand that I am buying the property 'as-is' with out [sic] any warranty of habitability." In addition, the Agreement recites the sale price, the interest rate, and the term, and the Agreement requires the Couple to maintain the House, pay real-estate taxes, and obtain homeowners insurance.

*Id.* (alterations and omission original to *Rainbow Realty*). The Court also recognized that all of the couple's payments under the agreement were "amortized payments of principal and interest" that were to be credited toward a total purchase price. *Id.* (quotation marks omitted).

But the Court concluded that, while "most of the transaction's terms and formal structure suggest this was a sale," the "purported form and assigned label do not control its legal status." *Id.* The Court then held that the initial term of two years represented a residential lease, and the remaining term of twenty-eight years was a contingent term. *Id.* In so holding, the Court stated that the couple never acquired any equity in the premises during the initial two-year term:

If the purported rent-to-buy agreement were really a purchase agreement, . . . the Couple would have become homeowners with "all incidents of ownership" and with "equitable title [vesting in the Couple] at the time the contract is consummated"—and, in most cases, would not be subject to residential eviction in a small-claims court. *Skendzel*[, 301 N.E.2d at 646, 650]. Here, the Agreement required a separate contract to effectuate a sale. No equity accrued or accumulated during the first twenty-four months. If the Couple defaulted before executing the subsequent "Land Contract", or if they failed to make payments or to close this latter transaction, *they were subject to eviction and forfeiture of all payments made*. Of course, that is precisely what happened.

During the Agreement's twenty-four-month term, [the property owners] reserved for themselves a landlord's prerogative to enter the premises, restricted the Couple's use of the land, and, upon the Couple's default, evicted them as if they were tenants and kept their "rental payments". *These features, taken together, are particular to a residential lease.* Thus, the parties' Agreement—a purported rent-to-buy contract—is not a "contract of sale of a rental unit" and thus is not exempt from [Indiana's residential landlord-tenant statutes].

*Id.* at 173-74 (emphases added). In other words, the *Rainbow Realty* Court concluded, at least in part, that the couple did not become the owners of the subject matter of the agreement at the time they executed the agreement. *See id.* Instead, the initial two-year term simply gave the couple the opportunity to later execute a second agreement, and it was that second, never-executed agreement that would have conveyed the incidents of ownership associated with the sale of land. *See id.*

[25] Shortly after our Supreme Court's opinion in *Rainbow Realty*, a unanimous panel of our Court decided *Vic's Antiques*. In that case, the occupant of the premises, a business, had entered into an agreement with the premises' purported owner, a neighboring business. The agreement was entitled "LEASE AGREEMENT"; referred to the occupant as the "Lessee" and the purported owner as the "Lessor"; referred to the monthly payments as "rent payments"; and referred to its twenty-year term as the "term of the lease." *Vic's Antiques*, 143 N.E.3d at 304. However, the occupant's monthly payments were also in accordance with "an amortized payment schedule," and the agreement required the occupant to pay the real-property taxes on the entire parcel of land. *Id.* Further, the agreement provided that, "in the event of a taking" by the State, payment by the State would go to the occupant. *Id.* The agreement also provided that, upon the successful completion of the twenty-year term, the occupant would have the "option to purchase [the parcel] for a purchase price of One Dollar ($1.00)." *Id.* at 306.

[26] Not even one year into the agreement, the purported owner asserted that the occupant had breached various provisions and initiated eviction proceedings. The occupant responded that the agreement was a land-sale contract and, thus, the small-claims court had no jurisdiction to evict it.

[27] Our Court held that, despite its labels, the agreement was in its substance a land-sale contract. *Id.* at 305-08. The panel initially acknowledged provisions of the agreement that were consistent with a residential lease, namely:

the agreement . . . : (1) limited [the occupant's] use of the real estate to the operation of an antique store; (2) required [the occupant] to obtain [the purported owner's] written approval before it could construct any improvements on the real estate; (3) allowed [the purported owner] to enter the property upon the termination of the agreement; (4) required [the occupant] to obtain written approval from [the purported owner] prior to constructing any signs; (5) provided that [the occupant] could remove business fixtures at the expiration of the term; (6) allowed [the purported owner] to enter the real estate at any time in order to inspect the property; (7) required [the occupant] to surrender the property at the expiration of the term; and (8) prohibited [the occupant] from assigning or subletting the real estate without [the purported owner's] prior written consent.

*Id.* at 305; *see also Rainbow Realty*, 131 N.E.3d at 174 (identifying several such features as "particular" to residential leases).

[28] But, while the panel "acknowledge[d] that such provisions are often included in lease agreements," the panel added that they were "not incompatible with a land sale contract." *Vic's Antiques*, 143 N.E.3d at 305. Specifically, the panel recognized that the seller in a land-sale contract is a secured creditor (in that the seller continues to hold the legal title), and the seller's secured status "may require reasonable limitations on nonessential incidents of ownership," such as the above provisions, in order "to protect [the seller's] security interest in the real estate." *Id.* What really mattered, according to the panel, was that the agreement at issue gave the occupant "the exclusive possession and use of the real estate," and the provisions reserved by the purported owner "did not deprive [the occupant] of its possessory or beneficial interest." *Id.*; *see also*

*Beneficial Interest*, Black's Law Dictionary (12th ed. 2024) (an "equitable claim to or right in property").

[29] From there, the panel's analysis is almost entirely focused on the "economics of the transaction," as provided for in the agreement. *Vic's Antiques*, 143 N.E.3d at 306. Specifically, the panel engaged in a lengthy analysis regarding the amortized principal and interest payments, which went toward a final purchase price; the substantial sum of interest the occupant would pay over the life of the agreement under the amortization schedule; and the nominal $1.00 purchase option at the end of the term, which the panel recognized that no reasonable person would not exercise. *Id.* at 306-08. Indeed, the panel referred to the amortization schedule as "the Rosetta Stone that unpacks and reveals the nature of the agreement." *Id.* at 306.

[30] The panel did not discuss the fact that *Rainbow Realty* also included an amortization schedule and payments that went toward a final purchase price, which applied even during the couple's initial two-year term. Rather, the *Vic's Antiques* panel distinguished *Rainbow Realty* on the ground that *Rainbow Realty* had involved a two-year contract with a twenty-eight-year option, while the panel described the *Vic's Antiques* agreement as, in its operation and effect, a "single transaction." *Id.* at 308. In other words, the occupant in *Vic's Antiques* became the owner of the subject matter of the agreement upon execution of the agreement. *See id.* Thus, the panel for our Court concluded that the agreement in *Vic's Antiques* was a land-sale contract and not a residential lease. *Id.*

With this background, we now turn to the Contract here. We begin with the parties' disputes over various provisions that, based on both *Rainbow Realty* and *Vic's Antiques*, may be consistent with both land-sale contracts and residential leases. In particular, the Contract here, like the agreement in *Rainbow Realty*, purported to waive various warranties, including the warranty of habitability. While such waivers make more sense in the context of a land sale, that did not control the outcome in *Rainbow Realty*. *See* 131 N.E.3d at 173. Further, the Contract, like the agreements in both *Rainbow Realty* and *Vic's Antiques*, contained various restrictions on McGhee and Duncan's use of the Premises and reserved a right to Freedom Property to access the Premises. *See id.* at 174; *Vic's Antiques*, 143 N.E.3d at 305. While such provisions make more sense in the context of residential leases, as explained in *Vic's Antiques* they are not inconsistent with a secured creditor's rights in a land sale. 143 N.E.3d at 305. Neither was the recording of the Contract here, without more, telling of equitable ownership as Indiana law requires a lease of more than three years to be recorded. I.C. § 32-31-2-1 (2019).

The Contract also stated that, in the event of a default by McGhee and Duncan, Freedom Property would "retain any payments made and all improvements to the Premises . . . ." Appellant's App. Vol. 3, p. 32. McGhee and Duncan contend that this is similar to language in the *Rainbow Realty* agreement. *See* 131 N.E.3d at 173-74. But it would be an odd credit arrangement to not have the borrower forfeit payments made to the creditor in the event of a default. And Freedom Property's retention of improvements to the Premises is not obviously

inconsistent with rights it may have in foreclosure, which would apply if the Contract were a land-sale contract.

[33]    Similarly, McGhee and Duncan emphasize that the Contract says Freedom Property may "evict" them in the event of a default. Appellant's App. Vol. 3, p. 32. But they misread the Contract. The Contract says Freedom Property may "evict or foreclose, as required by state law," which, on its face, is not telling of a remedy under either a residential lease or a land-sale contract. *Id.*

[34]    Meanwhile, Freedom Property, following the *Vic's Antiques* panel, emphasizes the amortization schedule and McGhee and Duncan's monthly payments of principal and interest toward a final purchase price over a set term. *See* 143 N.E.3d at 306-08. While we agree with the *Vic's Antiques* panel that such an economic arrangement will often be compelling evidence of the parties' intent to buy and sell land, we are obliged to acknowledge that such an arrangement is not dispositive as a matter of law. As *Rainbow Realty* demonstrated, such an arrangement may nonetheless be found in a lease agreement. *See* 131 N.E.3d at 173. So too with agreements that require occupants to pay taxes on the property and to insure the property. *Id.*

[35]    What matters in determining whether an agreement is a residential lease or a land-sale contract is not certain terms or economics in isolation but whether the agreement as a whole demonstrates that the parties intended to transfer ownership of the property *upon execution of the agreement*. *Skendzel*, 301 N.E.2d at 646. The occupant in *Vic's Antiques* demonstrated that that had happened

because, in a single transaction, the occupant obtained interests and obligations commonly recognized as incidents to ownership, such as the right to receive proceeds from the State in the event of a taking, the obligation to pay the property taxes on the entire parcel, and the right to "purchase" the entire parcel for the nominal sum of one dollar at the end of the agreement's term. 143 N.E.3d at 306-08. And the couple in *Rainbow Realty* demonstrated that their agreement was a lease because, notwithstanding various components of the agreement suggestive of a sale, the only interests they acquired in the property at the time they executed their agreement were a right to possess the premises and the right to sign another, subsequent agreement for the sale of the premises. *See* 131 N.E.3d at 173-74.

[36] We conclude that the Contract here demonstrated a present sale and purchase that, upon execution, vested in McGhee and Duncan incidents of ownership, including their assumption of the risk of loss of the Premises and their receipt of any appreciation in value in the Premises. First, the Contract here was a present sale and purchase contained in a singular agreement with no future options, which is more compelling as a sale than the nominal one-dollar option contained in the agreement in *Vic's Antiques*. By containing the entirety of the transaction in a singular agreement, McGhee and Duncan's right to obtain legal title to the Premises was a present right, not a contingent one, and thus the Contract is materially unlike the agreement in *Rainbow Realty*. Under the plain language of the Contract, so long as McGhee and Duncan fulfilled their side of the bargain, Freedom Property would have been required to provide them with

legal title to the Premises with no further payments. This is strongly indicative of a sale rather than a residential lease.

[37] Second, upon executing the Contract, McGhee and Duncan acquired interests and obligations commonly associated with ownership. For example, like the occupant in *Vic's Antiques*, McGhee and Duncan paid the property taxes on the Premises. Their tax payments were represented by a monthly surcharge that was subject to change as assessments changed, which is common to ownership. *See Skendzel*, 301 N.E.2d at 646. Similarly, they were the ones under the Contract who were obliged to pay to insure the Premises, another obligation commonly associated with ownership. While, under *Rainbow Realty*, we cannot say that these components of the Contract are dispositive, when coupled with the singular nature of the transaction they support the conclusion that the parties intended their transaction to be a sale and not a lease.

[38] Third, the Contract shows that both the risk of loss at the Premises and the receipt of any appreciation in value in the Premises were vested in McGhee and Duncan upon their execution of the Contract. Indeed, while the *Vic's Antiques* panel referred to that amortization schedule as "the Rosetta Stone that unpacks and reveals the nature of the agreement," we think the Contract's insurance provisions do the same here. 143 N.E.3d at 306. Unlike in *Rainbow Realty*, the Contract went well beyond simply having McGhee and Duncan pay the insurance premiums. Rather, the Contract provided McGhee and Duncan with the choice in how to spend any insurance proceeds in the event of a loss. That provision is strongly compelling of the parties' intent for their transaction to be

a sale, and McGhee and Duncan provide no persuasive explanation on appeal for how such language might be consistent with a lease.

[39] The Contract also expressly set a floor, not a ceiling, on the insurance policy amount McGhee and Duncan were required to purchase for the Premises. The floor represented the parties' understanding that the loan from Freedom Property would be protected in the event of a loss, which is consistent with its status as a secured creditor and is inconsistent with the argument that Freedom Property was a landlord.

[40] The Contract is also clear that any insurance proceeds in excess of the outstanding loan balance would have been owed to McGhee and Duncan. Thus, by having a required insurance floor but not a ceiling, McGhee and Duncan could have purchased insurance that would have protected appreciation in the Premises, which would have been owed to them in the event of a loss. And even where, as here, McGhee and Duncan purchased only the minimum required insurance amount, by having consistently made payments to Freedom Property under the amortization schedule, McGhee and Duncan had still acquired $6,435 of equity in the Premises at the time of the loss. These insurance provisions demonstrate hallmarks of equity and ownership that are inconsistent with a residential lease.

[41] We acknowledge that the record before us suggests that Freedom Property might not have complied with the Contract's insurance provisions with respect to allowing McGhee and Duncan to direct how to spend the insurance proceeds

following the fire and with respect to paying McGhee and Duncan their equity from those proceeds. We express no opinion on that question other than to recognize that, if Freedom Property in fact failed to comply with its obligations under the Contract, that fact does not negate the parties' intent to engage in a land sale at the time they executed the Contract. Whether Freedom Property later breached its obligations under the Contract is a question not before us.

## Conclusion

[42] For all of these reasons, we conclude that the Contract was a land-sale contract and not a residential lease. Accordingly, we reverse the trial court's order granting McGhee and Duncan's motion for summary judgment, and we remand with instructions for the court to grant Freedom Property's motion for summary judgment and to proceed as necessary to give effect to this opinion.[2]

[43] Reversed and remanded with instructions.

May, J., and Foley, J., concur.

---

[2] Although our review of an interlocutory appeal is limited to the order on appeal, McGhee and Duncan assert in their briefing that, on September 12, 2025, the trial court entered a subsequent order granting summary judgment to them on Freedom Property's additional request to compel their acceptance of title to the Premises. That order is not on appeal and is not before us. However, the September 12 order, as represented to us by McGhee and Duncan, would appear to be dependent on the trial court's August 14, 2025, summary judgment classification ruling — the very ruling we reverse today. Thus, on remand, the trial court shall reconsider and, as necessary, vacate or modify the September 12 order to conform to this Court's holding that the Contract is a land-sale contract and not a residential lease. We also note that McGhee and Duncan may well be entitled to the equity—in the form of the insurance proceeds paid that were in excess of their balance owed to Freedom Property—that had accrued after the fire destroyed their home.

ATTORNEYS FOR APPELLANT

James J. O'Connor, Jr.
Carta H. Robison
David C. Pricer
Barrett McNagny LLP
Fort Wayne, Indiana


ATTORNEYS FOR APPELLEES

Michael E. Simmons
Hannah K. Brady
Hume Smith Geddes Green & Simmons, LLP
Indianapolis, Indiana

Brandon E. Tate
Katherine A. Piscione
F. Holton Hovde
Waldron Tate Land, LLC
Indianapolis, Indiana